[Crim. No. 1222. Second Appellate District, Division Two.—September 21, 1925.]

THE PEOPLE, Respondent, v. H. S. JANSSEN et al., Defendants; J. D. JOINER, Appellant.

[1] CRIMINAL LAW — ACCOMPLICES—CORROBORATION. — In a criminal prosecution, the corroborative evidence necessary to meet the requirements of section 1111 of the Penal Code must of itself, and without the aid of the testimony of the accomplice, connect or tend to connect the defendant with the commission of the offense charged.

[2] ID.—GRAVE SUSPICION—PROOF OF OPPORTUNITY.—While the corroborative evidence must tend in some slight degree, at least, to implicate the defendant in the commission of the crime, more is required of it than merely to raise a grave suspicion; and

---

1. See 8 Cal. Jur. 177; 1 R. C. L. 169.
2. See 8 Cal. Jur. 179.

proof of opportunity to commit the crime is not of itself sufficient corroboration.

[3] Id.—Extortion—Corroboration of Accomplices—Insufficient Circumstances.—In this prosecution of a deputy marshal on a charge of extortion, the circumstances narrated by the witnesses who had no connection with the crime were as consistent with the innocence of defendant as with guilt, and they were not sufficient, singly or collectively, to constitute that corroboration which in the eyes of the law would support a verdict founded primarily upon the testimony of the accomplices.

[4] Id.—Conflicting Evidence — Appeal — Substantial Corroboration.—In a criminal prosecution, where there is a substantial conflict in the evidence the appellate court will not disturb the verdict of the jury, whose peculiar province it is to weigh the evidence and to determine the credibility of the witnesses; but where the evidence in support of the testimony of the accomplices is so attenuated that it does not rise to the dignity of corroboration, the appellate court may not ignore the rule of evidence, prescribed by the legislature, that to justify the conviction of a defendant, there must be substantial corroboration of the testimony of an accomplice.

(1) 16 **C. J.**, p. 701, n. 25, p. 702, n. 27.   (2) 16 **C. J.**, p. 706, n. 43, 44, p. 707, n. 66, p. 712, n. 26.   (3) 16 **C. J.**, p. 713, n. 31. (4) 16 **C. J.**, p. 929, n. 86, p. 930, n. 93; 17 **C. J.**, p. 264, n. 89, p. 267, n. 99, p. 271, n. 26, 27.

APPEAL from a judgment of the Superior Court of Imperial County and from an order denying a new trial. Franklin J. Cole, Judge.   Reversed.

The facts are stated in the opinion of the court.

W. E. Abraham for Appellant.

U. S. Webb, Attorney-General, and H. H. Linney, Deputy Attorney-General, for Respondent.

FINLAYSON, P. J.—The appellant Joiner and one Janssen were jointly charged with the crime of extortion. Joiner, who, with his codefendant, was found guilty as charged, appeals from the judgment of conviction and from an order denying his motion for a new trial.

4.  See 8 **Cal. Jur.** 620.

The sole point upon which appellant relies for a reversal is that the only evidence tending to connect him with the crime was that of three accomplices, D. E. Edwards, Jim Chadwick and G. W. Tucker, whose testimony was not corroborated as required by section 1111 of the Penal Code. That section, so far as applicable, reads: "A conviction cannot be had upon the testimony of an accomplice unless it be corroborated by such other evidence as shall tend to connect the defendant with the commission of the offense; and the corroboration is not sufficient if it merely shows the commission of the offense or the circumstances thereof."

The facts attending the immediate commission of the crime, as distinguished from appellant's alleged connection therewith, are practically undisputed and are substantially these: About midnight of September 1, 1924, Edwards, Chadwick and Tucker went to the house of a Japanese who was living on a ranch about four and one-half miles from the town of Brawley, in Imperial County, which had been leased to him by the defendant Janssen. Representing themselves to be officers who had come to search the place for contraband liquor, two of the three men drew pistols and pointed them at the Japanese. The three then demanded that the Japanese take them to the place where the liquor was hid, telling him that they would take the liquor to headquarters, but that if he would give each of them the sum of two hundred dollars they would release him. Overcome by fear, the Japanese gave the men a watch and one hundred dollars in cash, promising to raise the balance the following day. In addition to the money and the watch, the pseudo-officers took away about thirty gallons of whisky from a still which they found under a haystack on the place. On September 9, 1924, Edwards, Chadwick and Tucker were arrested. Later they were charged with the crime of extortion. They pleaded guilty and were serving their sentences at the time of the trial of Janssen and Joiner.

It is not claimed that either appellant or Janssen accompanied Edwards, Chadwick and Tucker to the ranch of the Japanese. The three who admitted their complicity in the perpetration of the extortion testified that early in the evening of September 1st, while seated in an automobile on one of the public streets of Brawley, Janssen proposed to

them that they be deputized to make a raid upon the still; that during this conversation Joiner, who was a deputy marshal of Brawley, was standing on the street not far away; that Janssen called to Joiner to come over; that the latter did as requested, and was introduced by Janssen to the three who later confessed their part in the extortion; that shortly after he was thus introduced to the three men, Joiner said he would deputize them to raid the still; that soon after this Janssen and Joiner departed, and, presently returning, Joiner gave the three alleged accomplices two guns and a badge; that Joiner then left the spot where the automobile was standing, and that later Edwards, Chadwick and Tucker ''staged the raid,'' as already narrated. A badge was found on Chadwick's sweater after his arrest. None of the three confessed culprits saw Joiner again until about the time of their arrest a week later. The foregoing is the sum and substance of the testimony given by the three men respecting Joiner's connection with the crime.

The only evidence which, independently of that given by the three alleged accomplices, tends in anywise to connect Joiner with the commission of the crime is substantially as follows: Upon three different occasions during the month preceding the extortion Janssen endeavored to persuade one William O'Brien, the constable of Brawley township, to join him in a pretended raid on a still which Janssen informed O'Brien was located on a ranch which he had leased to a Japanese. Through the information thus imparted to him, O'Brien, by searching the records of the county recorder's office, was able to locate the land on which the still was situated. Late in the afternoon of the day following the ''raid'' by Edwards, Chadwick and Tucker, O'Brien, accompanied by a deputy marshal of Brawley, the chief of police of that town, the undersheriff of Imperial County and the defendant Joiner, left Brawley in an automobile and rode to the ranch for the purpose of conducting a search for the still. · At that time O'Brien knew nothing of the exploit of Edwards, Chadwick and Tucker on the preceding night. He testified that he did not learn of it until six days later. Shortly before the officers departed from Brawley to search for the still, Joiner, who was then in the city hall, overheard O'Brien and the others talking about making a raid, and asked O'Brien if he might accompany

them. Permission to do so was given him. Thus it was that Joiner came to be one of the party led by O'Brien to the home of the Japanese. Arriving at the ranch, three of the officers left the automobile and conducted a search for the still. Joiner and O'Brien remained seated in the car. After a lapse of some time Joiner turned to O'Brien and said, "I expect I ought to have gone up there; I am a bear at that underground stuff." O'Brien testified that up to that time he had not told Joiner that the still on the premises then being raided was underground. However, the officers had taken with them an iron rod known as a "booze prong" or "joy prong," used by officers when searching for liquor underground.

On the 9th of September, after the arrest of Edwards and while he was being taken to jail, Joiner was seen talking to Janssen on one of the streets of Brawley. O'Brien testified that he saw the two talking to each other several times just prior to the arrest of Edwards, and also several times on the same evening following the arrest.

The badge which was found on Chadwick's sweater following his arrest was not of the kind generally used in Imperial County by peace officers. The sheriff of Cochise County, Arizona, testified that Joiner formerly lived in that county, where he had been a deputy sheriff; that at that time various kinds of badges were used by the deputy sheriffs of Cochise County, and that he had seen in that county badges similar to the one found on Chadwick's sweater. An examination of the badge with a magnifying glass disclosed on the reverse side the letter "J," scratched on the metal near the top, and also the letters "NM" at the bottom.

The chief of police of Brawley testified that at the time when Edwards, Chadwick and Tucker extorted the money from the Japanese he kept extra "guns" in a drawer of his desk in his office at the city hall, and that Joiner had a key to the office. The witness further testified, however, that he at no time missed any of the weapons.

[1] The corroborative evidence necessary to meet the requirements of section 1111 of the Penal Code must of itself, and without the aid of the testimony of the accomplice, connect or tend to connect the defendant with the commission of the offense charged. (*People* v. *Robbins,* 171

Cal. 466 [154 Pac. 317].) In *People* v. *Morton,* 139 Cal.
724 [73 Pac. 611], the supreme court quoted with approval
from *Welden* v. *State,* 10 Tex. App. 400, as follows: ''We
suggest this mode as a proper test: eliminate from the case
the evidence of the accomplice, and then examine the evi-
dence of the other witness or witnesses with the view to
ascertain if there be inculpatory evidence—evidence tend-
ing to connect the defendant with the offense.  If there is,
the accomplice is corroborated; if there is no *inculpatory*
evidence, there is no corroboration, though the accomplice
may be corroborated in regard to any number of facts
sworn to by him.''  And again, on the same page, our
supreme court says: ''In New York, under the same code
provision (Code Crim. Proc., sec. 399), it was said: 'The
corroboration, however strong in all other respects, must
point to the connection of the defendant with the *commis-*
*sion of the crime* to be of any avail.' (*People* v. *Ryland,*
28 Hun (N. Y.), 568, 570.)''

[2]  While the corroborative evidence must tend in some
slight degree, at least, to implicate the defendant in the
commission of the crime, more is required of it than merely
to raise a grave suspicion.  The rule as to the extent of
corroborating evidence necessary to support the testimony
of an accomplice is well stated in 12 Cyc., at page 456,
quoted with approval by our supreme court in *People* v.
*Robbins, supra:* '' 'It is necessary that the evidence cor-
roborating an accomplice shall connect or tend to connect
the defendant with the commission of the crime.  Cor-
roborative evidence is insufficient where it merely casts a
grave suspicion upon the accused.  It must not only show
the commission of the offense and the circumstances thereof,
but must also implicate the accused in it. . . . But where
the circumstances when proved, taken separately or collec-
tively, are consistent with the innocence of the accused,
there is no corroboration, and a verdict of conviction
thereon will be set aside.' ''  In that case the court further
said (171 Cal. 471 [154 Pac. 319]): '' . . . the corrobora-
tive evidence required to convict the defendant in addition
to that of the accomplice is not sufficient if it merely tends
to raise a suspicion of the guilt of the accused. . . . Mere
suspicion, as has been shown, will not suffice as corrobora-
tive evidence; and where the evidence relied upon as cor-

roborative of the accomplice is, as in the present case, only such as to raise a suspicion of the guilt of the defendant, the verdict must be set aside.'' Nor is proof of opportunity to commit the crime of itself sufficient corroboration. ''The fact that the defendant had an opportunity to commit it,'' says the court in *People* v. *Robbins* (p. 470), ''is of no particular significance as far as corroboration is concerned. Of course, the opportunity of the defendant to commit the particular crime for which he is on trial may always be shown in connection with other facts to establish his guilt; but we know of no rule which holds that mere opportunity to commit a crime is an incriminating corroborating circumstance.'' Again, on page 476: ''The proofs of mere suspicious circumstances and of opportunity to commit a crime are never sufficient to justify a conviction upon the testimony of an accomplice. (*People* v. *Thompson,* 50 Cal. 480; *People* v. *Smith,* 98 Cal. 218 [33 Pac. 58]; *People* v. *Koenig,* 99 Cal. 574, 576 [34 Pac. 238]; *State* v. *Willis,* 9 Iowa, 582; *People* v. *Morton,* 139 Cal. 725 [73 Pac. 609].)''

[3] Tested by these well-established rules, the conclusion is irresistible that the circumstances narrated by those witnesses who had no connection with the crime are not sufficient, singly or collectively, to constitute that corroboration which in the eyes of the law will support a verdict founded primarily upon the testimony of accomplices. The fact that appellant, a peace officer, was seen upon several occasions upon the streets of Brawley in conversation with Janssen shortly prior to and after the ''raid'' on the still by the three confessed culprits hardly rises to the dignity of a merely suspicious circumstance. It has no inculpatory value whatever.

Nor can we perceive any inculpatory evidence in the circumstance that appellant, when seated in the automobile with O'Brien while the other officers were conducting a search for the still, exclaimed, ''I expect I ought to have gone up there; I am a bear at that underground stuff.'' Because O'Brien testified that he had not told appellant that the still was underground, respondent argues that at the time when appellant made this statement he could not have known that the officers were searching for an underground still unless he previously had learned from Janssen or from some one of the three confessed culprits that the

still operated by the Japanese was concealed underground.. Wherefore it is argued that the exclamation was the unguarded outburst of a guilty knowledge. The argument is inconclusive. Even though O'Brien did not tell appellant that the expedition was to search for an underground still, the other officers who accompanied appellant and O'Brien doubtless had been informed of the nature of the proposed search. It is not at all improbable that from remarks dropped by some one of the officers other than O'Brien, while the party was on its way to the ranch, appellant concluded that the still of which they were in quest was one which was concealed underground. Moreover, as a peace officer charged with the duty to ferret out crime, appellant doubtless knew the purpose of the "booze prong" which the officers brought with them, and from the circumstance of its presence he may well have concluded that the search was to be made for an underground still. In short, if we import to the exclamation made by appellant in the presence of O'Brien the greatest possible significance, it does no more than raise a mere suspicion. Indeed, it seems to be as consistent with innocence as with guilt.

The circumstance that the badge found on Chadwick's sweater was of a kind similar to those which were used in Cochise County when appellant was a deputy sheriff in that county no more tends to connect him with the crime for which he is on trial than it would to raise a suspicion against hundreds of other persons. There is nothing in the evidence to indicate that badges of the kind found on Chadwick were used only in Cochise County, Arizona. For aught that appears to the contrary they may have been in use in many parts of the United States where appellant never resided. In fact, the letters "NM," scratched on the reverse side of the badge, have some tendency to show that the badge had been used in and was brought from the state of New Mexico—a state in which appellant has not been shown ever to have resided, and where it may have been accessible to innumerable persons. The fact that the letter "J" was etched on the reverse side of the badge has no inculpatory significance. It does not tend to connect appellant with the crime. The star may have been the property of any one of a host of persons the initial letter of whose names is "J." It may have belonged, for example,

to any one of the multitude who constitute the Jones family. See *People* v. *Ames,* 39 Cal. 403, and particularly the remarks of the court on page 405.

No significance inimical to the presumption of appellant's innocence can be attached to the fact that he possessed a key to the office in which the chief of police kept extra "guns." There is no pretense that any of these guns was ever taken by appellant. None was ever missed. At best this evidence only shows that appellant had an opportunity to take one or more of such weapons for the purpose of supplying the three accomplices with firearms. But the fact that appellant had an opportunity to commit the crime is of no particular significance, so far as corroboration is concerned.

For the foregoing reasons we are impelled to the conclusion that the evidence is insufficient to support the verdict. [4] It is, of course, true that where there is a substantial conflict in the evidence this court will not disturb the verdict of the jury, whose peculiar province it is to weigh the evidence and to determine the credibility of the witnesses. But in the present instance the evidence in support of the testimony of the accomplices is so attenuated that it does not rise to the dignity of corroboration. The legislature, acting within the scope of its authority, has provided that, to justify the conviction of a defendant, there must be substantial corroboration of the testimony of an accomplice. The law-making body doubtless had a good reason for this rule of evidence, and based it on what it conceived to be a sound public policy. The judicial department may not ignore the rule without unwarrantably invading the rights of the accused.

The judgment and the order denying a new trial are reversed.

Works, J., and Craig, J., concurred.