[Crim. No. 3147. Second Appellate District, Division One.—March 21, 1939.]

THE PEOPLE, Respondent, v. GEORGE BRAUN, Appellant.

Morris Lavine for Appellant.

U. S. Webb, Attorney-General, and Burdette J. Daniels, Deputy Attorney-General, for Respondent.

WHITE, J.—By an information filed against them by the district attorney of the county of Los Angeles, George Braun, Harry Groves, Ann Groves and John Roble were jointly accused in count I of the crime of murder and in count II of the offense of attempted murder. The defendants entered separate pleas of not guilty and went to trial thereon before a jury. During the progress of the trial defendant John Roble withdrew his plea of not guilty as to the charge of murder set forth in count I of the information and pleaded guilty thereto, at which time as to him count II was dismissed,

and he later testified as a witness for the People. Upon completion of the trial as to the remaining defendants, the jury returned verdicts finding defendants George Braun and Harry Groves guilty of murder in the first degree as charged in count I and recommended life imprisonment as punishment therefor; and also found the same defendants guilty of the crime of attempted murder as set forth in count II. Defendant Ann Groves was acquitted on both counts. Judgments having been pronounced pursuant to the laws of this state, defendant George Braun alone prosecutes this appeal therefrom.

The facts disclosed by the record as necessary for a consideration of this case are substantially as follows: On the early morning of March 20, 1938, the deceased, Presley B. Stewart, was the owner of and operating a cafe known as "The Bee Hive" in Los Angeles County. Shortly after 1 o'clock the defendants Roble and Groves, together with one Waller, the latter of whom was not apprehended, entered the cafe and attempted to rob Stewart at the point of guns. At that time appellant Braun, and defendant Mrs. Groves were present in the cafe, having entered some time previous, but neither of the last-named two actively participated in the attempted hold-up. Resistance being offered to the robbers, a fracas ensued, during which several shots were fired, resulting in the killing of the proprietor, Stewart, and the wounding of one Dan Preston, named as the victim in count II of the information. The three gunmen obtained some forty dollars from the cash register and fled the premises. Shortly thereafter on that same morning they, together with appellant Braun and defendant Mrs. Groves, met at the Groves apartment and departed for Arizona. While in Arizona, the party decided to disband, pursuant to which decision Waller and defendants Groves and Roble journeyed eastward, while appellant Braun and defendant Mrs. Groves returned to California via San Diego, in which latter city they surrendered themselves to officers of the law; while defendants Harry Groves and Roble were apprehended in Kansas City and returned to Los Angeles County for trial.

Appellant first challenges the sufficiency of the evidence to sustain the conviction on the ground that the same is totally lacking in any corroboration of the testimony of the

accomplice Roble, as required by section 1111 of the Penal Code. The theory of the prosecution was not that appellant Braun participated in any overt act at the time of the hold-up and murder, but that he planned the robbery and advised, counseled and encouraged Roble, Waller and Groves to rob the cafe in question. Direct testimony in this regard was supplied solely by defendant Roble, an admitted accomplice, when he testified as a prosecution witness. This witness testified that on the night of the hold-up he, appellant Braun, Harry Groves and Waller rode around in two automobiles, one a Pontiac and the other a Plymouth; that they stopped at Alhambra; that appellant Braun said that he knew Mr. Stewart, who operated the Bee Hive Cafe on Whittier Boulevard; that Mr. Stewart carried money in his wallet. The accomplice further testified that appellant Braun also said that he would go to the cafe first and be in the place and put up his hands, which would cause others in the place to do likewise. The witness testified that he, Waller and Groves went to the cafe in the Pontiac automobile, while appellant Braun preceded them in his Plymouth automobile; that when the accomplice, Waller and Groves arrived at the cafe, they saw Braun's car standing on the boulevard. The accomplice then related the occurrences at the Bee Hive Cafe as hereinabove set forth. He then testified that after leaving the cafe, he, Waller and Harry Groves went to the latter's apartment, and that later Mrs. Groves and appellant arrived there; that appellant said, ''We had to mope,'' meaning, according to the witness, that they had to leave; that thereupon he, the accomplice, divided the money he had taken with Groves and Waller; that they packed their clothes and left the apartment, appellant Braun and Mrs. Groves going in the former's Plymouth automobile, while Harry Groves, Waller and the witness left in the Pontiac car. According to the testimony of this accomplice, when they arrived in Arizona they went to a cafe operated by one Tony Damiano, from whence they proceeded to Phoenix, Arizona, where they rented cabins. While there, according to the testimony of the accomplice, appellant suggested that it would be best for Mrs. Groves and appellant to separate and go to Yuma, where they would try to get money for the remaining people in the party. The witness further testified that in another conversation appellant said to him, Waller

and Groves that they had "committed one murder" and "we might as well go out and get some guns and go first class".

The accomplice also testified that he first met appellant in the early part of March, 1938, and that appellant was a frequent visitor at the Groves apartment. The accomplice also testified that he had stolen a few cars before he had met appellant; that he stole the Pontiac car on March 16th, and also a Buick about that date; and that on Thursday or Friday, March 17th or 18th, three days before the robbery of the cafe, he, the witness, went to Alhambra and robbed two places en route, but did not involve appellant therein.

Appellant Braun took the witness stand in his own behalf at the trial; admitted he had previously been convicted of a felony in January, 1931, for which he served a term in an eastern penitentiary, having been discharged therefrom September 27, 1937; that he met one of the robbers, Leo Waller, in 1936, while both were confined in the penitentiary. He further testified that he arrived in Los Angeles during November, 1937, and lived with Waller for a few days during the *interim* until February 18, 1938; that he knew Mr. and Mrs. Groves, two of his codefendants; that he first met the codefendant Roble March 15, 1938. With reference to the night of March 19th and the early morning of the 20th, when the hold-up in question occurred, appellant testified that he was with Waller, codefendants Mr. and Mrs. Groves and Roble around 3 or 4 o'clock in the afternoon of the 19th; that subsequently an argument ensued between the defendant Groves and his wife, following which, appellant testified, he drove away with Mr. Groves, Waller and Roble, letting Groves and Roble out of the automobile, after which he drove around with Waller, finally arriving at the home of a Mrs. Martinsen, where all of the defendants and Waller were present. That Mr. and Mrs. Groves again engaged in an argument, which culminated in Mrs. Groves saying she was going to leave her husband, and appellant drove her to her apartment to get her belongings. Thereafter, appellant testified, he and Mrs. Groves drove around, finally arriving at the Bee Hive Cafe about midnight. Appellant further testified that he had frequented the Bee Hive Cafe since November, 1937, and was fairly well known there. He then related how a commotion started at the cafe and he observed Waller and another man struggling with each other, while defendant

Roble was grappling with still another man when the shooting started. Appellant further testified he was not armed and that he did not participate in the hold-up, and he related how defendant Mrs. Groves became hysterical when the shooting started, and that he finally drove her to the Groves apartment and there encountered Waller, Harry Groves and Roble. Appellant testified that he had been drinking considerably, and finally the entire party left the apartment in two automobiles, appellant testifying that he believed Waller was driving him home to his apartment; that he went to sleep in the rear seat, and when he awoke he found himself in Indio, California. Appellant testified that he was then in a stupefied condition, and the party proceeded eastward into Arizona; that after arriving at Phoenix, he and Mrs. Groves left the party to return to California. At Yuma, Arizona, appellant testified, he talked with a friend of his who was a police officer, and following that conversation he and Mrs. Groves decided to return and surrender to the authorities. Arriving in San Diego by automobile, appellant and Mrs. Groves accosted a police officer, showed the latter a newspaper with an account of the hold-up therein, and advised the officer that they were two of the people wanted by Los Angeles authorities in connection therewith; whereupon they were arrested. Appellant denied his participation in any criminal activities with his codefendants or Waller, and also disclaimed any knowledge on his part of the intended hold-up of the Bee Hive Cafe, and further denied that he had advised, counseled or encouraged the hold-up which culminated in the killing of the cafe proprietor and the wounding of Dan Preston.

There is no direct evidence connecting appellant with the crimes charged in the information, for the reason that he did not actually participate in the robbery or the shooting in connection therewith. He could be convicted, therefore, only on the ground that though inactive during the commission of the offenses, he had previously advised and encouraged the hold-up in the perpetration of which one man was killed and another wounded. The only direct evidence that appellant knew of the contemplated robbery or that he had previously advised and encouraged it is supplied by the witness Roble, and he concededly being an accomplice, his testimony must be corroborated. ''A conviction cannot be had upon the testimony of an accomplice unless it be corroborated by

such other evidence as shall tend to connect the defendant with the commission of the offense; and the corroboration is not sufficient if it merely shows the commission of the offense or the circumstances thereof. . . . '' (Pen. Code, sec. 1111.)

It will thus be seen that the statute imperatively makes corroboration of the testimony of the accomplice an essential prerequisite to the conviction of the defendant, where the crime charged rests primarily and solely upon the testimony of an accomplice; and it is apparent, therefore, that the court has no control over the subject except to apply the statute. In *People* v. *Morton,* 139 Cal. 719, 724 [73 Pac. 609], our Supreme Court quoted with approval the following language found in *Weldon* v. *State,* 10 Tex. App. 400: '' . . . eliminate from the case the evidence of the accomplice, and then examine the evidence of the other witness or witnesses with the view to ascertain if there be any inculpatory evidence— evidence tending to connect the defendant with the offense. If there is, the accomplice is corroborated; if there is no *inculpatory* evidence, there is no corroboration, although the accomplice may be corroborated in regard to any number of facts sworn to by him.'' In the same case of *People* v. *Morton, supra,* our Supreme Court voices its approval of the rule as stated in *Simms* v. *State,* 8 Tex. App. 230: ''The evidence must tend directly and immediately to connect the defendant with the commission of the offense.''

In New York, under a code provision similar to our own (Code Crim. Proc., sec. 399), it was said in *People* v. *Ryland,* 28 Hun, 568, 570, ''The corroboration, however strong in all other respects, must point to the connection of the defendant with the commission of the crime to be of any avail.''

That more is required by way of corroboration than mere suspicion is firmly established in the law of this state. (*People* v. *Kempley,* 205 Cal. 441, 456 [271 Pac. 478], and cases therein cited; *People* v. *Davis,* 210 Cal. 540 [293 Pac. 32].) In *People* v. *McLean,* 84 Cal. 480 [24 Pac. 32], we find the following:

''But although more is required by way of corroboration than to raise a mere suspicion (see *People* v. *Thompson,* 50 Cal. 480), yet the corroborating evidence is sufficient if it, of itself, tends to connect the defendant with the commission of the offense, although it is slight, and entitled, when standing by itself, to but little consideration.''

The query of how much is required in order to constitute corroboration has been answered by many cases wherein it is decided that "corroborative evidence is insufficient when it merely casts a grave suspicion upon the accused". (*People* v. *Robbins,* 171 Cal. 466, 470 [154 Pac. 317] ; *People* v. *Woodcock,* 52 Cal. App. 412, 417 [199 Pac. 565] ; *People* v. *Janssen,* 74 Cal. App. 402, 407 [240 Pac. 799].) In *People* v. *Allison,* 200 Cal. 404 [253 Pac. 318], the court is given no alternative but to set aside the conviction unless the testimony of the accomplice is corroborated in accordance with section 1111 of the Penal Code as that statute has been interpreted by the courts. (See, also, *People* v. *Robbins, supra,* at p. 469.)

Having in mind the foregoing legal principles, we now turn to the record to discern in what respects, if at all, the testimony of the accomplice Roble was sufficiently corroborated. Through the testimony of other witnesses, including that of appellant himself, numerous facts were proved. There was evidence that Braun was present in the Bee Hive Cafe when the hold-up and homicide took place, by reason whereof he had an opportunity to participate in the crimes; but proof of mere opportunity raises no more than a suspicion of guilt, and that is insufficient. (*People* v. *Robbins, supra*; *People* v. *Morton, supra*; *People* v. *Koening,* 99 Cal. 574 [34 Pac. 238].) It was also established that appellant had associated with the actual perpetrators of the crime, but such conduct again gives rise only to a suspicion of guilt that he advised, encouraged and participated in the crimes. (*People* v. *Long,* 7 Cal. App. 27 [93 Pac. 387] ; *People* v. *Koening, supra*; *People* v. *Fagan,* 98 Cal. 230 [33 Pac. 60].) It is admitted by appellant that following the commission of the crimes he drove to the apartment of his codefendant Groves, and a few hours later accompanied the actors in the hold-up to Arizona, but in this connection it should be remembered that Mrs. Groves was with appellant and that when he drove to the apartment of her husband he was taking her home. It is contended that by accompanying the codefendants to Arizona appellant evidenced a consciousness of guilt, but such an inference is more or less negatived by the testimony as to his drunken condition, coupled with the fact that he immediately returned from Arizona and surrendered to the police. However, we think that neither singly nor collectively do these circumstances lend any weight to the conclusion that appel-

lant advised or encouraged the robbery which resulted in the murder and attempted murder with which he was charged; and his guilt thereof is dependent upon legal evidence that he did advise or encourage the commission of the robbery. We have carefully read the entire record, and upon a consideration thereof we are compelled to state that when the testimony of the accomplice is eliminated from the case, as it must be for the purpose of determining the question of corroboration (*People* v. *Robbins, supra*), the other evidence in the case furnishes no substantial proof that appellant either advised or encouraged the commission of the robbery in question.

That it arouses a suspicion, even a grave suspicion, may be conceded, but that is insufficient to establish the corroboration required by law. In every instance the allegedly corroborative circumstance requires recourse to the testimony of the accomplice to give it direction. Without the aid of the accomplice's testimony, and standing alone, the circumstances, while generating a suspicion of guilt, are as compatible with innocence as they are with guilt. As was said in *People* v. *Morton, supra,* quoting from *Childers* v. *State,* 52 Ga. 106, speaking of defendants convicted on the testimony of an accomplice, "It may be these men are bad, guilty men, but if they are convicted, it ought to be under the rules of law. To justify this verdict would be, in our judgment, to make the best men in the land subject to the danger of conviction by any guilty scoundrel who might attack them."

The accomplice in the case before us acknowledged from the witness stand his own infamy. He admitted committing a series of robberies and the larceny of two automobiles; he also exhibited resentment against appellant for the reason, as stated by him, that appellant had advised him to commit crime and had failed to send him money in accordance with appellant's alleged promise. Probably also the fact that after he surrendered to the police appellant made a statement to them of the happenings in the Bee Hive Cafe on the night of the crime influenced the accomplice in his hostile attitude toward appellant. We do not refer to these matters for the purpose of arriving at a conclusion that the accomplice's story ought not to be believed by the jury, but for the purpose of emphasizing the duty imposed upon us to scrutinize other evidence in the record which the prosecution claims measures up to that standard of corroborative evidence demanded by our

law. ■ The prosecution undoubtedly had the right to present the testimony of an accomplice even though, as in this case, they dismissed a serious charge against him, to wit, that of attempted murder as charged in count II of the information, before he took the stand; but when they do avail themselves of that right they must expect the testimony of such a witness to be viewed in the light of the reward extended him, in so far as the motives arising therefrom might prompt him in the giving of his testimony. ■ Neither are we unmindful of the profligate and more or less dissolute character of appellant, who admitted a prior conviction of felony and a course of personal conduct not consistent with good morals, but we are not now concerned with the guilt or innocence of appellant, further than to say that without the testimony of the accomplice the prosecution made no case against him of advising or encouraging the commission of the robbery of the Bee Hive Cafe. Whether guilty or innocent, the appellant was entitled to have his case fairly tried according to the established rules of law, and as said by a learned judge, "Though unfair means may happen to result in doing justice to the prisoner in the particular case, yet justice so attained is unjust and dangerous to the whole community." (*Hurd* v. *People*, 25 Mich. 405.) The doctrine that respect for the law cannot be inspired by withholding the protection of the law is one which recognizes no exceptions.

Illegitimate and unconstitutional practices get their first footing by silent approaches and slight deviations from established legal modes of procedure. In a strong dissenting opinion delivered by Mr. Justice Sutherland of the Supreme Court of the United States, in *Associated Press* v. *National Labor Relations Board*, 301 U. S. 103 [57 Sup. Ct. 650, 81 L. Ed. 953], we are counseled to "withstand all beginnings of encroachment. For the saddest epitaph which can be carved in memory of a vanished liberty is that it was lost because its possessors failed to stretch forth a saving hand while yet there was time." The acquittal of a guilty person is truly a miscarriage of justice, but the conviction of an innocent person through relaxation of those fundamental legal principles such as the one with which we are here concerned, would be a tragedy. It is the duty of the courts to be watchful for the constitutional and individual rights of the citizen and against any stealthy encroachments thereon.

■ It is next contended by appellant that the court erred in permitting evidence of other offenses allegedly committed by defendants, and particularly in admitting evidence of the commission of other crimes by some of the defendants other than appellant. At the outset of the trial, the district attorney stated that he intended to prove that ''these defendants, George Braun, John Roble, Harry Groves, Ann Groves, and one Leo Waller, were in a conspiracy, and had a general plan, system and scheme to commit a series of robberies in and around the County of Los Angeles; that included in this general scheme, conspiracy and plan was the robbery of the Bee Hive Cafe on Whittier Boulevard, in the City and County of Los Angeles, State of California''. Summarized, the salient features of such evidence were as follows:

That on February 14, 1938, the defendants Roble and Harry Groves, at the point of guns, held up and robbed a cafe located between the cities of Pomona and Ontario. There was evidence of the presence of a third but unidentified man on this occasion. Appellant, however, was not identified as being present. That on March 16th defendants Waller and Roble stole an automobile from a parking station. That on January 31, 1938, appellant, Harry Groves and Roble, armed with deadly weapons, held up and robbed employees of the United Independent Dairies. That on March 16th Harry Groves, Roble and Waller robbed Mr. and Mrs. Harry Salman in their home.

■ It is now definitely settled as the law of this state that upon the trial of an accused for the commission of a particular crime, the prosecution may show as a part of its case that such crime was committed in furtherance of a conspiracy to commit a series of like or other criminal acts (*People* v. *Schmidt*, 33 Cal. App. 426 [165 Pac. 555]; *People* v. *Arnold*, 199 Cal. 471 [250 Pac. 168]); and such evidence is not rendered inadmissible because it shows that the accused committed other and distinct crimes in furtherance of the common object of the conspiracy. (*People* v. *Zimmerman*, 3 Cal. App. 84 [84 Pac. 446]; *People* v. *Anderson*, 59 Cal. App. 408 [211 Pac. 254].) However, in the instant case, there is no testimony whatever, other than the insufficiently corroborated testimony of the accomplice, that appellant participated in or advised or encouraged the commission of any

of the aforesaid offenses, except as to the United Independent Dairies hold-up, where appellant was identified by one of the victims. Timely objections and appropriate motions to strike were made on behalf of appellant, and this testimony should have been limited by the court in its application to the defendants who participated in the respective robberies, and therefore should have been excluded as to the appellant, except in the Dairy case, in connection with which there was competent evidence of appellant's participation.

That this line of testimony was prejudicial to appellant cannot be questioned and is evidenced by the fact that Mrs. Ann Groves, one of the defendants whose participation in the Bee Hive Cafe robbery was akin to that of appellant, was acquitted, while the latter was convicted. Moreover, and in connection with this type of evidence, the court if a retrial is had should be careful to instruct the jury that the defendant is on trial solely for the offenses charged in the information, to wit, murder and attempted murder, alleged to have been committed on March 21, 1938, as set forth in the information, and is not on trial for conspiracy, nor for any offenses other than the ones charged in the information; and that as to evidence concerning other crimes happening before the 21st of March, such evidence should be considered by the jury for the limited purpose of determining whether a conspiracy existed between the defendants to commit a series of robberies or like criminal offenses. (*People* v. *Sampsell*, 104 Cal. App. 431, 440 [286 Pac. 434].) No such instructions were given, and as to this appellant such failure was prejudicial error, both from the standpoint of the lack of evidence to show his participation in any except one of the other offenses, and as to the other offense in connection with which appellant was identified; for in the absence of the admonition just suggested, the jury was free to erroneously consider such evidence as corroborative of the testimony of the accomplice and as proof of defendant's guilt of the offenses for which he was on trial.

No other questions presented demand our consideration.

For the foregoing reasons, the judgment is reversed and the cause remanded for a new trial.

York, P. J., and Doran, J., concurred.

A petition by respondent to have the cause heard in the Supreme Court, after judgment in the District Court of Appeal, was denied by the Supreme Court on April 20, 1939. Shenk, J., and Edmonds, J., voted for a hearing.